Case No.: 19-13390

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

FCOA, LLC,

Appellant,

vs.

FOREMOST TITLE & ESCROW SERVICES, LLC,

Appellee.
_____

Appeal from the United States District Court
For the Southern District of Florida

Case No.: 1:17-cv-23971-KMW
_____


INITIAL BRIEF OF APPELLANT FCOA, LLC


WILLIAM D. HORGAN
Florida Bar No. 176877
ADRIENNE C. LOVE
Florida Bar No. 21835
PENNINGTON, P.A.
215 South Monroe Street
Suite 200
Tallahassee, FL 32301
850-222-3533
whorgan@penningtonlaw.com
adrienne@penningtonlaw.com
COUNSEL FOR APPELLANT
FCOA, LLC

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1 and 28-1(b), Appellant FCOA, LLC,

hereby lists the following persons and entities:

Farmers Group, Inc. (affiliate of Appellant)

Farmers Insurance Exchange (affiliate of Appellant)

FCOA, LLC (Appellant)

Fire Insurance Exchange (affiliate of Appellant)

Foremost Insurance Company (affiliate of Appellant)

Foremost Insurance Service Center (affiliate of Appellant)

Foremost Title & Escrow Services, LLC (Appellee)

Horgan, William D. (counsel for Appellant)

Horton, J. Wiley (counsel for Appellant)

Love, Adrienne C. (counsel for Appellant)

Nigro, Benjamin P. (counsel for Appellee)

Pennington, P.A. (counsel for Appellant)

Shaikh, Natasha  (counsel for Appellee)

Stok Folk + Kon  (counsel for Appellee)

Stok Kon + Braverman  (counsel for Appellee)

Stok, Robert  (counsel for Appellee)

Torres, Edwin G., United States Magistrate Judge

Truck Insurance Exchange (affiliate of Appellant)

Williams, Kathleen M., United States District Judge

Zurich Insurance Group, Ltd. (ZFSVF) (affiliate of Appellant)

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument in this matter. Oral argument will assist the Court to consider the issues presented by this appeal, and therefore allow its full consideration.

# TABLE OF CONTENTS

Table of Citations    i

Statement of Jurisdiction    v

Statement of the Issues    1

Statement of the Case    2

    I.    *Course of Proceedings and Disposition Below*    2

    II.    *Statement of Facts*    6

        A.    *FCOA and the Foremost Family of Marks*    6

        B.    *Foremost Title & Escrow*    10

    III.    *The Standard of Review*    12

Summary of the Argument    13

Argument    16

    I.    *The District Court Erred When Considering the Strength of FCOA's Foremost Mark*    17

        A.    *The District Court Improperly Regarded the Existence of Registrations and Business Names as Evidence of Third-Party Use*    19

        B.    *The District Court Did Not Consider the Length and Manner of Use and FCOA's Promotion of the Mark*    28

    II.    *The District Court Did Not Properly Consider the Overall Commercial Impression of the Parties' Marks When Evaluating Their Similarity*    31

    III.    *Factor Three – The Similarity of the Parties' Products*    46

IV.     *The District Court Did Not Properly Consider Factors*
        *Four and Five – The Similarity of the Parties' Retail*
        *Outlets, Customers and Advertising Media*                    47

V.      *Factors Six and Seven – FT&E's Intent and Actual Confusion*   52

VI.     *Summary*                                                      53

Conclusion                                                             55

Certificate of Compliance                                             56

Certificate of Service                                                 56

# TABLE OF CITATIONS

**Cases**

*AmBrit, Inc. v. Kraft, Inc.*,
    812 F.2d 1531 (11th Cir. 1983)          25, 48

*Armstrong Cork Co. v. World Carpets, Inc.*,
    597 F.2d 496 (11th Cir. 1979)          26

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
    711 F.2d 934 (10th Cir. 1983)          34, 43

*Bellsouth Corp. v. Internet Classifieds of Ohio*,
    1997 WL 33107251 (N.D. Ga. 1997)          24

*Breakers of Palm Beach, Inc. v. International Beach Hotel Dev., Inc.*,
    824 F.Supp. 1576 (S.D. Fla. 1993)          22

*Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*,
    871 F.2d 590 (6th Cir. 1989)          30

*Carnival Brand Seafood Co. v. Carnival Brands, Inc.*,
    187 F.3d 1307 (11th Cir. 1999)          37

*Conagra, Inc. v. Singleton*,
    743 F.2d 1508 (11th Cir. 1984)          17, 28, 30, 36, 37

*Contemporary Rest. Concepts, Ltd. v. Las Tapas – Jacksonville, Inc.*,
    753 F.Supp. 1560 (M.D. Fla. 1991)          22

*Cunningham v. Laser Golf Corp.*,
    222 F.3d 943 (Fed. Cir. 2000)          53

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*,
    109 F.3d 275 (6th Cir. 1997)          21, 22, 34, 37

*Dieter v. B&H Indus. of S.W. Fla., Inc.*,
    880 F.2d 322 (11th Cir. 1989)          17

i

*E.&J. Gallo Winery v. Consorzio del Gallo*,
    782 F.Supp. 457 (N.D. Cal. 1991)         35

*El Chico, Inc. v. El Chico Café*,
    214 F.2d 721 (5th Cir. 1954)         26

*E. Remy Martin & Co. S.A. v. Shaw-Ross Int'l Imports, Inc.*,
    756 F.2d 1525 (11th Cir. 1985)         12

*FN Herstal SA v. Clyde Armory, Inc.*,
    838 F.3d 1071 (11th Cir. 2016)         19-20

*Foremost Corp. of Am. v. Burdge*,
    638 F.Supp. 496 (D.N.M. 1986)         17

*Freedom Sav. & Loan Ass'n v. Way*,
    757 F.2d 1176 (11th Cir. 1985)         32, 45, 51

*Frehling Enterprises, Inc. v. International Select Group, Inc.*,
    192 F.3d 1330 (11th Cir. 1999)         3, 4, 5, 6, 16, 27-28, 31-32, 48

*Glen Raven Mills, Inc. v. Ramada Int'l, Inc.*,
    852 F.Supp. 1544 (M.D. Fla. 1994)         21, 24

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
    858 F.2d 70 (2d Cir. 1988)         53

*Health Net v. USA Healthnet, Inc.*,
    26 U.S.P.Q.2d 1187 (C.D. Cal. 1993)         40

*Homes & Land Affiliates, LLC, v. Homes & Loans Magazine, LLC*,
    598 F.Supp.2d 1248 (M.D. Fla. 2009)         25, 26

*Humana, Inc. v. Humanomics, Inc.*,
    3 U.S.P.Q.2d 1696 (T.T.A.B. 1987)         35

*Jensen Enters., Inc. v. Rind*,
    85 U.S.P.Q.2d 1104 (T.T.A.B. 2007)         21

*John H. Harland Co. v. Clarke Checks, Inc.*,
711 F.2d 966 (11th Cir. 1983)     28, 32, 34, 44

*Kenner Parker Toys, Inc. v. Rose Art Studios, Inc.*,
963 F.2d 350 (Fed. Cir. 1992)     30

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*,
128 F.3d 1111 (7th Cir. 1997)     40, 42-43, 43

*North Am. Med. Corp. v. Axiom Worldwide, Inc.*,
522 F.3d 1211 (11th Cir. 2008)     39 n.9

*PlayNation Play Sys., Inc. v. Velex Corp.*,
924 F.3d 1159 (11th Cir. 2019)     22, 24, 28, 30, 48

*Pro Hardware, Inc. v. Home Ctrs. of Am., Inc.*,
607 F.Supp. 146 (S.D. Tex. 1984)     23

*Quality Inns, Int'l v. McDonald's Corp.*,
695 F.Supp. 198 (D. Md. 1989)     35

*Reader's Digest Ass'n v. Conservative Digest, Inc.*,
821 F.2d 800 (D.C. Cir. 1987)     30

\*     *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*,
675 F.2d 1160 (11th Cir. 1982)     12, 14, 21, 22, 25, 38, 42, 44, 50, 51

*Scarves by Vera, Inc. v. Todo Imports Ltd.*,
544 F.2d 1167 (2d Cir. 1976)     20, 30

*7-Eleven, Inc. v. Wechsler*,
83 U.S.P.Q.2d 1715 (T.T.A.B. 2007)     36

*Silverton Mtg. Specialists, Inc. v. FDIC*,
2012 WL 13001592 (N.D. Ga. 2012)     22-23

*Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes
and of Malta v. The Fla. Priory of the Knights Hospitallers of the Sovereign
Order of St. John of Jerusalem, Knights of Malta, The Ecumenical Order*,
809 F.3d 1171 (11th Cir 2015)     51

*Standard Acc. Ins. Co. v. Standard Sur. & Cas. Co. of N.Y.*,
    53 F.2d 119 (S.D.N.Y. 1931)      50

*Sun Banks of Fla., Inc. v. Sun Fed. Savings & Loan Ass'n*,
    651 F.2d 311 (5th Cir. 1981)      26

*Trilink Saw Chain, LLC v. Blount, Inc.*,
    583 F.Supp.2d 1293 (N.D. Ga. 2008)      21, 22

\*    *Turner v. HMH Publ'g Co.*,
    380 F.2d 224 (5th Cir. 1967)      13, 18, 19, 20

*UMG Recordings, Inc. v. Mattel, Inc.*,
    100 U.S.P.Q.2d 1868 (T.T.A.B. 2011)      32

\*    *University of Ga. Athletic Ass'n. v. Laite*,
    756 F.2d 1535 (11th Cir. 1985)      13, 18, 19

*Varitronics Sys., Inc. v. Merlin Equip., Inc.*,
    682 F.Supp. 1203 (S.D. Fla. 1988)      21

*Wynn Oil Co. v. Thomas*,
    839 F.2d 1183 (6th Cir. 1988)      43

**Statutes and Rules**

15 U.S.C. § 1114(1)(a)      16

**Other Authorities**

Thomas McCarthy, *McCarthy on Trademarks
& Unfair Competition § 23:42 (5th ed)*      *37*

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The United States District Court for the Southern District of Florida has subject matter jurisdiction over this trademark infringement action pursuant to 28 U.S.C. §§ 1331 and 1338, as a federal question is presented. (Doc. 1 ¶ 2).

The United States Court of Appeals for the Eleventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. This is an appeal from a final judgment entered by the United States District Court for the Southern District of Florida on August 1, 2019, followed by a notice of appeal filed on August 29, 2019. (Doc. 153, 157).

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether, when analyzing the strength of FCOA's Foremost marks as part of the likelihood-of-confusion analysis in this trademark infringement action, the district court erred by (a) holding that the "existence" of third-party registrations and business names using the term Foremost rendered the Foremost marks weak, and (b) seemingly failing to consider the commercial strength of FCOA's Foremost marks.

2.    Whether, when analyzing the similarities of the parties' marks, the district court erred by conducting only a side-by-side analysis of the parties' logos which did not consider the overall commercial impression made by the parties' use of the marks, including the facts that both parties use FCOA's trademarked term Foremost as the dominant theme of their advertising and that FT&E often advertises itself to insurance consumers as solely "Foremost."

3.    Whether the district court erred when it failed to weigh the similarity of the parties' advertising efforts into its likelihood-of-confusion analysis.

4.    Whether the district court erred when it determined that the parties' customer bases are dissimilar given that both parties indisputably cater to consumers who are purchasing insurance for real property.

## <u>STATEMENT OF THE CASE</u>

This is an appeal from a final summary judgment rendered by the United States District Court for the Southern District of Florida against Appellant FCOA, LLC ("FCOA"), which brought this trademark infringement action against Appellee FOREMOST TITLE & ESCROW SERVICES, LLC ("FT&E").  (Doc. 1).[1]

### I. *Course of Proceedings and Disposition Below*

For over sixty years, FCOA and its predecessors have owned and used in the insurance industry a family of what is now over twenty registered trademarks related to the word "FOREMOST," including FOREMOST (U.S. Reg. No. 1,403,411); FOREMOST (No. 2,414,933); FOREMOST (No. 1,900,833); FOREMOST (No. 2,154,409); and FOREMOST (No. 1,821,706).  (Doc. 86 ¶ 6).  This includes use in the particular insurance markets of property insurance, homeowners' insurance, landlord insurance and mobile home insurance, which consumers often buy when purchasing real property.  (Id. ¶ 10).

Foremost Title & Escrow Services, LLC is a Florida title insurance agency which began operation in 2015.  FT&E operates its title insurance agency utilizing

---

[1]    The complaint was originally filed in the Northern District of Florida.  (Doc. 1).  This matter was transferred to the Southern District of Florida soon thereafter.  (Doc. 12).

the term "Foremost" in its business name, logo, and advertising. It refers to itself solely as "Foremost" in its advertising, on the internet, and in its slogans. (Id. ¶¶ 22-24, 36-38). Foremost acts as a title insurance agent during real property closings, so it sells title insurance to persons who are purchasing real property. (Id. ¶¶ 30-35).

In October 2017, FCOA filed this action against FT&E for federal trademark infringement, unfair competition and false designation of origin, federal dilution, common law unfair competition, and state anti-dilution under section 495.151, Florida Statutes. (Doc. 1). FCOA alleged that FT&E was creating a likelihood of confusion in the consuming public by offering insurance services under the similar mark "Foremost Title & Escrow" and sometimes, simply "Foremost." (Id.).

After discovery, both parties moved for summary judgment. (Docs. 84, 86, 87, 99, 104, 105). The district court analyzed the likelihood-of-confusion factors enumerated in *Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999), which are an element of every cause of action FCOA brought. (Doc. 151). The district court's findings were as follows.

The first factor is the strength of the Foremost mark. *Frehling*, 192 F.3d at 1335. The district court concluded that because the Foremost mark is "incontestable" under 15 U.S.C. §§ 1065 and 1115, it is "descriptive with secondary meaning" and presumed to be a strong mark. (Doc. 151 at 8-9). However, based on trademark registrations and a list of business names, the district court held that "the

existence of 62 marks and 541 entities, unrelated to FCOA, using the term Foremost"
outweighed the presumption that the Foremost mark is strong, held that it is instead
relatively weak, and weighed this factor against a finding of likelihood of confusion.
(Id. at 10).

During the analysis of this first factor, the district court accepted trademark
registrations and a list of business names as evidence of third-party use; did not
consider what fields of business the purported third-party users operated in, or their
geographic scope; did not consider the full business names of the purported third-
party users; and did not consider the manner in which the purported third-party users
may have utilized any mark. In addition, the district court seemingly did not
consider the length and manner of FCOA's use of the Foremost mark or the extent
and nature of its advertising and promotion. (Doc. 151 at 6-10).

The second factor is the similarity of the marks. *Frehling*, 192 F.3d at 1335.
The district court examined the parties' logos, including the words within them, and
determined that although both logos use the word Foremost, "that on its own is not
sufficient to find a likelihood of confusion, and viewing the mark as a whole, there
are enough differences to find that this factor does not weigh in favor of a finding of
likelihood of confusion." (Doc. 151 at 12). In reaching this conclusion, the district
court seemingly did not consider the facts that FT&E is using the FCOA's
trademarked term "Foremost" by itself to describe FT&E and that both parties are

using the word Foremost as the dominant theme in their advertising. This is not discussed in the order. (Id. at 10-12).

The third factor is the similarity of the parties' products. *Frehling*, 192 F.3d at 1335. Because FCOA markets insurance products typically purchased by real property buyers and owners, and FT&E markets title insurance, the district court held that this favor weighed in favor of a likelihood of confusion because "reasonable consumers could conclude both parties' products are attributable to a single source." (Id. at 13).

The district court combined the fourth and fifth factors for likelihood of confusion – the similarity of the parties' trade channels and customers and the similarity of their advertising – into one analysis. *Frehling*, 192 F.3d at 1335. The court determined that both parties offer insurance products to homeowners so there is potential overlap between their customer bases. (Doc. 151 at 14). However, the court also determined that the parties' customer bases "appear to differ" because "FT&E's client base is comprised mostly of SFK[2] referrals and because FT&E's customers generally make their decisions based on recommendations from brokers or agents . . . ." (Id.). Thus, the district court held this factor to be neutral. (Id. at

---

[2]      SFK is a law firm affiliated with FT&E. It is now known as Stok Kon + Braverman. This is discussed further below.

15).  The court seemingly did not weigh into its analysis the fact that the parties' advertising media are identical.

The sixth and seventh factors are the defendant's intent and the existence of actual confusion.  *Frehling*, 192 F.3d at 1335.  As to intent, the district court found that "this factor does not favor a finding of a likelihood of confusion."  (Doc. 151 at 16).  The court also found that FCOA offered no evidence of actual confusion.  (Id. at 18).

Upon examining these likelihood-of-confusion factors, the district court held that FCOA had not established that FT&E's use of a Foremost mark creates a likelihood of confusion with FCOA's use.  (Id.).  Thus, the court granted FT&E's motion for summary judgment and entered final judgment in its favor.  (Id. at 18-19; doc. 152).

## II.    Statement of the Facts

### A.    FCOA and the Foremost Family of Marks

Foremost Insurance Company was founded in 1952 and began using the trademark FOREMOST in connection with its insurance services and products. (Doc. 86 ¶ 3).  Foremost Corporation of America was eventually formed to hold its

assets and later changed its name to FCOA.[3]  (Id.).  FCOA now owns all goodwill

and interest in a family of over twenty registered "Foremost" marks which are used

extensively in the insurance business nationwide.  (Id. ¶ 6).  These marks include

FOREMOST  (U.S.  Reg.  No.  1,403,411);  FOREMOST  (No.  2,414,933);

FOREMOST  (No.  1,900,833);  FOREMOST  (No.  2,154,409);  and  FOREMOST

(No. 1,821,706).[4]

Within international trademark class 036, which encompasses the insurance

and financial fields, FCOA owns seventeen of the twenty registered marks bearing

the word "Foremost."  The other three marks are World Foremost Bank, Building

Foremost Companies, and BFC Building Foremost Companies, which are listed for

use in connection with banking and business acquisition consulting. (Id. ¶ 21).

FCOA's Foremost marks are thus the only registered marks bearing the name

Foremost and listed for use in the insurance industry.  (Id.).

---

[3]      These entities are part of the Farmers Insurance Group.  (Doc. 86 ¶ 3).

[4]      The other marks are FOREMOST INSURANCE SERVICE CENTER (No. 2,894,849); FOREMOST MEANS MORE (No. 5,204,859); FOREMOST CHOICE (No. 5,133,612); FOREMOST EDUCATION (No. 5,149,286); THE FOREMOST INSURANCE GUY (No. 4,224,479); WHY NOT FOREMOST? (No. 4,236,833); FOREMOST OUTDOORS (No. 3,820,713); FOREMOST PAYONLINE (No. 3,668,651); TAKE FOREMOST ALONG FOR THE RIDE. (No. 3,401,596); GO AHEAD. TAKE FOREMOST HOME. (No. 3,594,177); GO AHEAD. ASK FOR FOREMOST.  (No.  3,618,202);  FOREMOST  CLASSIC  (No.  3,037,369); FOREMOST  AUTOLINK  (No.  2,075,734);  FIRST  AND  FOREMOST  (No. 1,936,293); FOREMOST EXPRESS (No. 1,911,781); and FOREMOST BASICS (No. 1,896,463).  (Doc. 1 ¶¶ 8, 9).

Over 3,000,000 customers currently hold Foremost-branded property, homeowners', mobile home, landlord, fire and business insurance policies in the United States, including 95,000 customers in Florida, and Foremost-branded insurance comprises roughly 30% of the market in mobile home owner insurance nationwide. (Id. ¶ 10). Foremost-branded insurance products are offered by over 33,000 insurance agents at more than 77,000 locations nationwide. (Id. ¶ 11). Foremost insurance policies are also sold directly to consumers in Florida (and elsewhere) without the involvement of an agent. (Doc. 82-2 at 28:19-29:16). In 2017, Foremost-branded insurance premiums exceeded $2,400,000,000 in the nation and $81,000,000 in Florida. (Doc. 86 ¶ 15). Its property insurance premiums alone were estimated to exceed $1,000,000,000 in 2018. (Id. ¶ 16).

The American Association of Retired Persons ("AARP") has endorsed Foremost-branded insurance, which allows FCOA to reach tens of millions of consumers worldwide and roughly 2,700,000 consumers in Florida through advertisements in AARP magazine, which has the largest magazine readership in the United States, and other joint AARP-Foremost advertisements. (Id. ¶¶ 12-13). Numerous independent publications have recognized Foremost-branded products and services. (Id. ¶ 19). Over the past few years, FCOA expended an average of nearly $7,000,000 annually to advertise and promote the insurance products it offers under its Foremost marks. (Id. ¶ 14).

Foremost-branded insurance products are advertised on the website www.foremost.com, but also through other websites, online advertising and social media. FCOA[5] also advertises at trade shows and other public events, and through magazine ads and brochures. (Id. ¶¶ 17-20). It also advertises via direct email. (Doc. 82-2 at 28:19-29:16). FCOA advertises to the public generally, but also targets certain selected advertising materials directly to property owners, including homeowners, developers, and landlords. (Doc. 86 ¶¶ 17-20).

FCOA sometimes uses its Foremost mark in connection with other wording. For example, the Foremost Insurance Group logo, used on many advertising media, is shown below:



(Doc. 86 ¶ 7). In addition, FCOA uses its Foremost mark to refer to the Foremost family of insurance businesses in various advertising phrases such as "Call the friendly Foremost agent for a quote," "Foremost has you covered," "Let Foremost help your business," "Choose Foremost," "Call the specialists at Foremost for a quote today," "Foremost coverage has real life advantages," and "Get specialized coverage from Foremost." (Doc. 85-1 at 8-12; doc. 83-2 at 640, 898).

---

[5]     Like FCOA's filings below, for efficiency this brief sometimes uses the term FCOA to refer to related Foremost-affiliated companies.

### B. Foremost Title & Escrow

FT&E was formed in 2015, at which time it adopted and began using the mark "Foremost Title & Escrow" in connection with its title insurance agency. (Id. ¶¶ 22-23). As a title insurance agent, FT&E is licensed by the state of Florida to "transact insurance." (Doc. 85-12 at exhibit 14 at 1). Thus, FT&E sells title insurance under its Foremost mark. (Doc. 108 at 9). FT&E is associated with the law firm of Stok Folk + Kon ("SFK"),[6] which refers title insurance customers to FT&E. (Doc. 151 at 2, 14).

FT&E also offers closing services for real property closing transactions. (Doc. 86 ¶ 23). FT&E has conducted around twenty real property closings for customers referred to it by SFK law firm. (Id. ¶ 35). Its customers include landlords who are purchasing, and therefore must insure, property to be rented to others. (Id. ¶ 31). To advertise its services to consumers, FT&E utilizes a website, online advertising, and social media. (Id. ¶¶ 25-29). FT&E also advertises at trade shows and other public events, and through local magazine ads. (Id. ¶¶ 28-29). It also advertises via direct email to homeowners. (Id. ¶ 28).

FT&E targets its advertising toward homeowners, landlords and developers – persons who are buying or selling real property. (Id. ¶ 30). This includes, but is not limited to, owners of multi-tenant dwellings who then serve as landlord of the

---

[6]     Stok Folk + Kon is now known as Stok Kon + Braverman. (Doc. 154-2 ¶ 1).

transacted property. (Id. ¶ 31). Ultimately, the end consumer of FT&E's title insurance and closing services is a property buyer or seller. (Doc. 85-8 at 11:8-16).

On its website, which is www.fortitle.net, FT&E advertises to consumers that it offers title insurance services along with references to insurance, insurance coverage, and agency services. (Doc. 85-26 at 1-4; doc. 85-13 at 30:22-31:5, 31:10-12; doc. 85-8 at 19:8-25, 33:12-20). For instance, FT&E advertises to the public that it "issues insurance" and its website defines the terms "homeowners' insurance" and "manufactured homes." (Doc. 86 ¶ 27). FT&E's website also uses the term "Foremost" by itself as a keyword for search engine optimization in web searches. (Id. ¶ 37).

FT&E sometimes advertises its insurance services to consumers by dropping the phrase "Title & Escrow Services" from its name and referring to itself only as "Foremost." (Id. ¶ 36). For instance, FT&E advertises using the phrases "Choose Foremost" (which FCOA also uses), "Foremost for Homeowners," "Foremost's staff has experience in all facets of title insurance," and "Expect the Most, Close with Foremost." (Id.). In addition, a consumer entering FT&E's website immediately encounters a pop-up window stating, "Let Foremost help you buy your next home." (Doc. 85-29).

FT&E also adopted the below logo.



(Doc. 86 ¶ 42).

### III.    *The Standard of Review*

In the Eleventh Circuit, a district court's determination on the subject of a likelihood of confusion is a matter of fact which the Court may overturn if clearly erroneous.  *E. Remy Martin & Co. S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1529 (11th Cir. 1985).  Under this standard, a court may reverse if it is left with a definite and firm conviction that a mistake has been made.  *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1164 (11th Cir. 1982).

However, if the district court misapplied the law, the Court must review and correct the error without deference to the district court's determination on that issue.  *E. Remy Martin*, 756 F.2d at 1529.  In other words, the Court reviews the district court's findings of fact for clear error and its application of the law *de novo*.  *Id.*

# SUMMARY OF THE ARGUMENT

The district court erred in multiple respects when determining whether FT&E's use of the Foremost mark is likely to cause confusion amongst consumers. These errors, which were mostly errors in the application of the law reviewed *de novo*, occurred when the district court analyzed the strength of FCOA's marks, the similarity of the parties' marks, the similarity of the parties' customers, and the similarity of their advertising media.

When evaluating the strength of the Foremost mark, the district court erred when it concluded that the "the existence of 62 marks and 542 entities unrelated to FCOA using the Foremost mark" rendered the Foremost marks weak. (Doc. 151 at 10). The strength of a plaintiff's mark is only diminished when unauthorized third-party use is significantly diminishing the public's perception of the mark. *University of Ga. Athletic Ass'n. v. Laite*, 756 F.2d 1535, 1545 n.27 (11th Cir. 1985). Trademark registrations are not evidence of third-party use of a mark or evidence that public perception is being affected, *Turner v. HMH Pub. Co.*, 380 F.2d 224, 228 n.2 (5th Cir. 1967), and neither is a list of business names. In addition, when evaluating the strength of the Foremost marks, the district court did not properly consider their undisputed commercial strength. Thus, the district court erred in finding that FCOA's presumptively strong marks were actually weak. It should have found them to be strong.

When evaluating whether the parties' Foremost marks are similar, the district court erred because it did not fully consider the overall commercial impression made by the parties' use of the mark, and instead conducted a side-by-side analysis of the parties' logos. (Doc. 151 at 12). The district court did not properly factor into its analysis the undisputed facts that both parties are using the term Foremost as the dominant theme of their advertising or that FT&E regularly advertises to insurance consumers by referring to itself as simply "Foremost." The district court also wrongly concluded that the generic words "Title & Escrow" distinguish FT&E from FCOA. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982).

The district court also erred when it failed to consider that the parties' advertising efforts are identical. Both parties advertise to the insurance-buying public using internet advertising, websites, social media, magazine ads, brochures, trade shows, public events and direct mailings. The district court combined the subject of the parties' advertising media with another likelihood-of-confusion factor but then did not address it. (Doc. 151 at 13-15). This was a legal error because it deprived FCOA of consideration of a factor which weighs squarely in its favor.

Finally, the district court erred when it determined that the parties' customer bases were dissimilar. Both parties market to real property purchasers who need

insurance.  This is not changed by the fact that insurance agents are sometimes involved in the purchase of insurance.

When evaluated fully and properly, these factors weigh in favor of a likelihood of consumer confusion, and FCOA should have received summary judgment.

# ARGUMENT

A defendant commits trademark infringement when, without the trademark holder's consent, it uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" in a manner which "is likely to cause confusion." 15 U.S.C. §1114(1)(a). The district court erred when it considered the likelihood-of-confusion component of that analysis.

In the Eleventh Circuit, a court examines seven factors to determine whether a likelihood of confusion exists: (1) the strength of the plaintiff's mark, including whether it has reached incontestable status, the type of mark it is, the degree to which third parties make use of the mark, and the length and manner of the plaintiff's use and promotion of service under it; (2) the similarity of the two marks in overall commercial appearance including sound, visual appearance, and manner of use; (3) the similarity of the products the marks represent; (4) the similarity of the parties' customers and trade channels; (5) the similarity of their advertising media; (6) the defendant's intent; and (7) actual confusion. *Frehling*, 192 F.3d at 1335.

As explained below, the district court erred when considering factors 1, 2, 4 and 5. When properly considered, each of these facts weigh in favor of a likelihood of confusion amongst the parties' marks, and the district court should have granted summary judgment in favor of FCOA.

I. The District Court Erred When Considering the
Strength of FCOA's Foremost Mark

The first factor in the likelihood-of-confusion analysis is the strength of the Foremost mark. *Id.* It is one of the two most important factors. *Id.* In the Eleventh Circuit, the strength of a mark is evaluated by considering the nature of the mark, whether the mark is incontestable, third-party use of the mark, and the length and manner of the mark's use and promotion. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir. 1984); *Dieter v. B&H Indus. of S.W. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989).

The district court concluded that because the Foremost marks are "incontestable" under 15 U.S.C. §§ 1065 and 1115, they are "descriptive with secondary meaning" and are therefore presumed to be strong marks. (Doc. 151 at 8-9). In the Eleventh Circuit, a mark which has gained incontestable status is indeed presumed to be strong. *Dieter*, 880 F.2d at 329. In addition, the Foremost family of marks was found strong over 30 years ago. *Foremost Corp. of Am. v. Burdge*, 638 F.Supp. 496, 500 (D.N.M. 1986).

Based on trademark registrations and a list of business names using the term Foremost, however, the district court held that "the existence of 62 marks and 541 entities, unrelated to FCOA, using the term Foremost" outweighed this presumption of strength, concluded that the Foremost marks are therefore relatively weak, and

weighed this factor against a finding of consumer confusion. (Doc. 151 at 10). The court erred twice in that process.

First, the district court wrongly concluded that third-party use of the Foremost mark rendered them weak based on trademark registrations and a list of business names. *University of Ga. Athletic Ass'n. v. Laite*, 756 F.2d 1535, 1545 n.27 (11th Cir. 1985); *Turner v. HMH Pub. Co.*, 380 F.2d 224, 228 n.2 (5th Cir. 1967). Third-party use only decreases the strength of a mark if the defendant illustrates that (1) there truly is third-party use of the mark in question, and (2) the third-party use is diminishing the strength of the plaintiff's mark, which, as a matter of law, trademark registrations and a list of business names do not show. *Univ. of Ga.*, 756 F.2d at 1545 n.27; *Turner*, 380 F.2d at 228 n.2. This is a legal error reviewed *de novo* because the district court misapplied the law surrounding third-party use of trademarks.[7]

Second, the Court did not weigh into its analysis the commercial strength of the FCOA marks. It is undisputed that FCOA has extensively marketed and promoted the Foremost marks for decades, at great cost and with great result, but the district court seemingly did not consider this undisputed evidence when analyzing the strength of the Foremost marks.

---

[7]    This conclusion is also clear error to the extent any question of fact may be involved.

### A. *The District Court Improperly Regarded the Existence of Registrations and Business Names as Evidence of Third-Party Use*

The district court erred by determining that trademark registrations and a list of business names constituted third-party use that is weakening the Foremost marks. The district court held that "the existence of 62 marks and 541 entities . . . using the term Foremost" rendered the Foremost marks relatively weak. (Doc. 151 at 10). This was an error because the mere existence of trademark registrations and business names using the term Foremost is not evidence of third-party use which diminishes the strength of the Foremost marks. *Univ. of Ga.*, 756 F.2d at 1545 n.27; *Turner*, 380 F.2d at 228 n.2. Rather, third-party use only weakens a mark when it is shown that actual use is occurring, and that it is occurring under circumstances which are demonstrated to be diminishing the public's perception of the plaintiff's mark, neither of which is shown by registrations or a list of business names.

The Court has made it clear that "unauthorized third-party uses of a mark do not necessarily render the mark weak. The proper inquiry is whether the unauthorized third-party uses *significantly diminish the public's perception that the mark identifies items connected with owner of the mark*." *Univ. of Ga.*, 756 F.2d at 1545 n.27 (emphasis added). In other words, third-party use only decreases the strength of a trademark when there is actual *use* of the trademark which occurs in a manner which is affirmatively shown to be significantly diminishing the public's perception of the plaintiff's mark. Otherwise, third-party uses are not relevant. *FN*

*Herstal SA v. Clyde Armory, Inc.*, 838 F.3d 1071, 1085 (11th Cir. 2016) *citing Univ. of Ga*, 756 F.2d at 1545 n.27.

Federal registrations are not evidence of third-party use. *Turner*, 380 F.2d at 228 n.2. This makes common sense because, though it may go without saying, a federal registration does not show that the mark is actually in use *or* that the public's perception of the plaintiff's mark has been affected by its use. In *Turner*, the Court explained:

> Defendants submitted a number of exhibits of copies of third-party registrations of trademarks of the name "Playboy" in aid of their argument that the mark "Playboy" was diluted by wide usage of the public . . . . *We will not assume any knowledge on the part of the purchasing public by mere registrations in the Patent Office, nor will we assume that the marks are in continuing use*, *so as to have any effect on the mind of the purchasing public merely because they had been so registered.*

*Id.* (emphasis added).

Utilizing this same logic, courts within and without the Eleventh Circuit routinely hold that trademark registrations are not evidence of use of a mark or evidence that the plaintiff's mark is being diminished in the eyes of the public. *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers … [T]he existence of [third party] registrations is not evidence of what happens in the market

place or that customers are familiar with their use"); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 281 (6th Cir. 1997) (mere existence of registrations without identification of what actually happens in the marketplace is not enough to show that the distinctiveness of plaintiff's mark is weakened); *Varitronics Sys., Inc. v. Merlin Equip., Inc.*, 682 F.Supp. 1203, 1207 (S.D. Fla. 1988) ("the mere *citation* by MEI of third-party registrations, however, is not sufficient proof of the relative weakness of the mark.  MEI has not offered any proof as to the extent to which, if at all, any of these marks is *used*) (emphases in original); *Glen Raven Mills, Inc. v. Ramada Int'l, Inc.*, 852 F.Supp. 1544, 1548 n.2 (M.D. Fla. 1994) (third party registrants who do not use the mark are irrelevant); *Jensen Enters., Inc. v. Rind*, 85 U.S.P.Q.2d 1104 *6 (T.T.A.B. 2007) (third-party registrations "do not prove that the marks are in use or that the public is familiar with them").

Rather, "the significance of third-party use is evaluated based on the entire name and symbol, the type of business in which it is used, and geographic location." *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F.Supp.2d 1293, 1312 (N.D. Ga. 2008); *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982).  To properly evaluate third-party use, then, a court must consider "the entire name that the third party uses," any associated symbology, what kind of

business the third party is conducting, and where.  *Safeway Stores*, 675 F.2d at 1165;

*Trilink Saw Chain*, 583 F.Supp. at 1312.

Only by examining those factors might a court begin to consider whether third-party use is diminishing the public's perception of a plaintiff's mark at all.  *See, e.g., Trilink Saw Chain*, 583 F.Supp.2d at 1312 (strength of mark not diminished because there was no evidence that third parties used the mark in a manner confusingly similar to plaintiff's use); *Contemporary Rest. Concepts, Ltd. v. Las Tapas – Jacksonville, Inc.*, 753 F.Supp. 1560, 1563 (M.D. Fla. 1991) (third-party use did not diminish strength of mark where defendant "failed to demonstrate third-party usage in a format similar to" plaintiff's); *Breakers of Palm Beach, Inc. v. International Beach Hotel Dev., Inc.*, 824 F.Supp. 1576, 1584 (S.D. Fla. 1993) ("Defendant has only pointed out that these uses exist but has not demonstrated that they have any impact on the public's perception regarding the strength of Plaintiff's mark"); *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 281 (courts must evaluate third party marks in view of relatedness of services to marks at issue).

This too makes common sense because third-party use in a business unrelated to the plaintiff's industry is irrelevant – "similar marks used by third parties in unrelated businesses or markets do not diminish the strength of a mark in a particular market."  *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1166 (11th Cir. 2019), *citing Safeway Stores*, 675 F.2d at 1167; *Silverton Mtg. Specialists, Inc. v.*

*FDIC*, 2012 WL 13001592 *13-14 (N.D. Ga. 2012) (dozens of third-party uses did not diminish mark where there was no evidence of market overlap between plaintiff and third parties). This is particularly true where, as here, FCOA does not seek protection of its marks outside of the field of insurance. *Pro Hardware, Inc. v. Home Ctrs. of Am., Inc.*, 607 F.Supp. 146, 151 (S.D. Tex. 1984) (third-party marks outside field held irrelevant where plaintiff did not seek to protect its marks outside its field).

Because registrations are not evidence of third-party use at all (and certainly not of third-party use *in a manner which is diminishing the strength of a plaintiff's mark*), the mere "existence" of registrations does not weaken FCOA's marks. Third-party registrations do not prove that the third-party marks are in use or that the public is familiar with them, which is a preliminary step in showing that they have weakened the plaintiff's mark, so the district court erred when it held that the existence of third-party registrations alone somehow weakened the Foremost marks.

The same is true of a list of business names containing the word Foremost, which is no better than a list of trademark registrations. FT&E filed a list of business names printed from secretaries of state's webpages.[8] (Doc. 22-1 at exhibit K). The district court erred when it found that the "existence" of mere business names

---

[8] FT&E searched the webpage of every state Secretary of State for the term Foremost, printed the listings, and filed them with the court. (Doc. 22-1 at exhibit K).

containing the word Foremost weakened the Foremost marks. This list of names does not show whether each business is or is not active, *where* they are active, what business they are in, or whether these business names are even used in commerce as a source identifier in connection with any good or service at all.

Like the existence of registrations, the mere existence of business names containing the word Foremost does not show that an entity is actively using the Foremost mark today, which may not be the case; does not show what industry they are operating in, which may be distinct from the insurance industry; does not show the geographic scope of their operations, which may be exceedingly minimal; does not show use in a manner confusingly similar to, or similar in format to, FCOA's use of the mark; and does not show that the public perception of the Foremost mark is being diminished. This is simply not proven by a list of business names. *See, e.g., Bellsouth Corp. v. Internet Classifieds of Ohio*, 1997 WL 33107251 *15 (N.D. Ga. 1997) ("thousands" of website names using trademarked terms did not diminish strength of mark where defendant offered no proof that they were known to the public or used in plaintiff's industry); *Glen Raven Mills*, 852 F.Supp. at 1549 (third-party use in isolated geographic areas or limited use in widespread area does not diminish public perception of plaintiff's mark); *PlayNation*, 924 F.3d at 1166 (purported third-party uses outside the plaintiff's field of business do not diminish the strength of the mark in that field).

Just as to registrations, the district court erred when it found that the mere existence of any business name, anywhere in the country, in any line of business, that happened to contain the word Foremost was evidence that FCOA's Foremost marks were being diminished. *See, e.g., Safeway*, 675 F.2d at 1167 (twenty marks containing one of the same words as the plaintiff's mark did not "significantly diminish the strength of the plaintiff's mark" because the other marks were used by "businesses not closely related" to the plaintiff's business).

Thus, the district court should have allowed the presumption of strength to remain as there was no evidence to rebut it. With presumptively strong marks and no evidence of third-party use which is diminishing their public perception, the presumption stands, and the district court should have weighed this first factor in favor of FCOA.

The cases cited by the district court do not apply. In *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1539 (11th Cir. 1983), a trade dress case which did not involve a defendant attempting to overcome a presumptively strong mark, the Court held that frozen dessert maker Klondike's trade dress was of moderate strength, not weak, where eight other entities were selling frozen desserts using a polar bear image and "numerous" other entities were doing so with silver foil, a sun, or a royal blue color. *AmBrit*, 812 F.2d at 1539. In *Homes & Land Affiliates, LLC, v. Homes & Loans Magazine, LLC*, 598 F.Supp.2d 1248 (M.D. Fla. 2009), the Middle District of

Florida determined that there was "widespread" use of the word Homes in the very line of business the plaintiff was in – real estate listing magazines and websites. *Homes & Land*, 598 F.Supp.2d at 1261. In *El Chico, Inc. v. El Chico Café*, 214 F.2d 721 (5th Cir. 1954), decided long before the law of third-party use has ripened to its current state, the Court determined that the term El Chico was a weak mark because it is extensively used as the name of towns, rivers and people; was used "for a long time on many sorts of articles;" is a common first name; and because there were 27 trademark registrations using the term. *El Chico*, 214 F.2d at 725. In *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (11th Cir. 1979), the Court determined that the fact that plaintiff's mark World was subject to use by 85 other carpet companies weakened the mark. *Armstrong*, 597 F.2d at 505. Finally, in *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n*, 651 F.2d 311 (5th Cir. 1981), the Court held that over 4,400 Florida users of the term Sun, including around 50 active users within the financial industry, were weakening the mark Sun when used in connection with banking. *Sun Banks*, 651 F.2d at 316, 316 n.8.

None of those circumstances exist here. There is no evidence that others are extensively using the Foremost mark in the insurance industry in a manner which diminishes its strength. Indeed, there is no evidence of *any* use of the Foremost mark in the insurance industry *at all*. The list of business names presented by FTE does not universally show whether the businesses are currently active, when the business

was formed, or *whether the businesses offer any service or good to the public at all*, let alone whether any of them use the term "Foremost" as a source identifier.

The only business names on the list that include the term "insurance" are directly affiliated with FCOA. Aside from FCOA-related entities, no other business name in FT&E's list contains the word "insurance." (Doc. 22-1 at exhibit K). Indeed, within international trademark class 036, which encompasses the insurance and financial fields, there are twenty registered marks bearing the word Foremost. Of those, seventeen are FCOA's registered Foremost marks. The other three marks are World Foremost Bank, Building Foremost Companies, and BFC Building Foremost Companies, which are listed for use in connection with banking and business acquisition consulting, not insurance. (Doc. 86 ¶ 21). FCOA's Foremost marks are thus the only marks bearing the name Foremost registered for use in the entire insurance industry.

It appears that the district court simply counted the number of "uses" of the word Foremost on the face of the registrations and business names, concluded this exceeded the numbers present in *Ambrit, Homes & Land*, and *El Chico* (and other similar cases) and therefore determined that the Foremost mark must be weak. (Doc. 151 at 10). This was legal error.

Indeed, the lack of evidence of relevant third-party marks supports a finding that the Foremost mark is *strong* in the insurance industry. *Frehling*, 192 F.3d at

1136 (district court erred by failing to factor lack of third-party use into its consideration of strength of mark). Nobody else is using the Foremost mark in the insurance industry. The district court therefore reached exactly the opposite conclusion it should have reached on the evidence before it.

### B. The District Court Did Not Consider the Length and Manner of Use and FCOA's Promotion of the Mark

The district court also made a second error when considering the strength of FCOA's marks – it did not consider their commercial strength. This too is a factor a court should evaluate, and while the district court appears to have recognized FCOA's argument on this point, it seemingly did not consider or weigh the undisputed evidence which tends in its favor on this subject. (Doc. 151 at 8).

When analyzing the strength of a mark, a court should consider the length and manner of the mark's use and the extent and nature of its advertising and promotion. *Conagra*, 743 F.2d at 1513; *PlayNation*, 924 F.3d at 1166; *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 n.13 (11th Cir. 1983). A mark may gain strength through "[it's owner's] promotional efforts," so this is a factor in the overall strength of a mark. *John H. Harland*, 711 F.2d at 974 n.13. The evidence is undisputed that FCOA advertises and promotes the Foremost marks very extensively and at great cost, which increases their strength. (Doc. 86 ¶¶ 3-6, 11-20).

For over fifty years, FCOA and its predecessors have owned and used in the insurance industry a family of what is now over twenty registered trademarks related to the word Foremost. (Doc. 86 ¶¶ 3-6). FCOA now expends an average of nearly $7,000,000 per year to advertise and promote the insurance products it offers under its Foremost marks. (Id. ¶ 14). Over 33,000 insurance agents at more than 77,000 locations across the country offer Foremost-branded insurance policies with annual premiums recently exceeding $2,400,000,000 in the nation and $81,000,000 in Florida. (Id. ¶¶ 11, 15). Its property insurance premiums alone were estimated to exceed $1,000,000,000 in 2018. (Id. ¶ 16). Over 3,000,000 customers currently hold Foremost-branded property, homeowners', mobile home, landlord, fire and business insurance policies throughout the United States, including 95,000 in Florida, and Foremost-branded insurance comprises roughly 30% of the nationwide market in mobile home owners' insurance. (Id. ¶ 10). The AARP has endorsed Foremost insurance, which is now marketed to tens of millions of potential customers worldwide and roughly 2,700,000 in Florida through AARP magazine, the most widely read magazine in the United States, and other joint AARP-Foremost advertisements. (Id. ¶ 12). FCOA also advertises Foremost-branded insurance via its own website, email, social media, magazines, brochures and other media. (Id. ¶¶ 17-20). Numerous independent publications have recognized Foremost-branded services. (Id. ¶ 19). Survey evidence showed that 52.9% of respondents in South

Florida market who purchased property insurance had heard of Foremost Insurance Company. (Doc. 85-7 at 8-9).

This significant, decades-long, costly, and successful effort to promote Foremost-branded insurance products is evidence of the strength of the Foremost family of marks now. *PlayNation*, 924 F.3d at 1166 (affirming district court determination that "significant nationwide advertising and promotion" since 2002 enhanced the strength of the mark); *Conagra*, 743 F.2d at 1513 (prominent display of mark for decades combined with significant advertising weighed in favor of mark strength); *Silverton*, 2012 WL 13001592 at *14 (plaintiff's conduct of business over ten years and advertising investment of $260,000 indicated mark strength in Atlanta area).

The Foremost mark is used on diverse insurance products, advertised at significant cost, generates significant sales volume over a large geographic area, and is recognized in numerous independent publications, each of which indicates its strength. *Kenner Parker Toys, Inc. v. Rose Art Studios, Inc.*, 963 F.2d 350, 355 (Fed. Cir. 1992); *Reader's Digest Ass'n v. Conservative Digest, Inc.*, 821 F.2d 800, 805 (D.C. Cir. 1987); *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989); *Scarves by Vera,* 544 F.2d at 1174.

In summary, the district erred when it determined that the Foremost marks are weak. The marks are presumed to be strong marks with secondary meaning because

they are incontestable, and the district court wrongly concluded that the "existence" of third-party registrations and business names diminished their strength. Registrations and business names do not show use of the term Foremost in commerce; do not show use of term Foremost as an active identifier for goods or services; do not show use of the term Foremost in the insurance industry; do not show use of the term in format similar to FCOA's; and do not show that the public perception of the Foremost marks is being affected at all, much less that the perception is being diminished substantially enough to overcome the presumption of their strength. In addition, the district court did not consider that the Foremost marks are strengthened by their length and manner of their longtime use and promotion.

With presumptively strong marks used for decades to successfully promote insurance products, and no evidence of third-party use which is diminishing their strength in the insurance market, the district court should have found the Foremost marks to be strong within the insurance industry and weighed this first factor in favor of FCOA.

## II. The District Court Did Not Properly Consider the Overall Commercial Impression of the Parties' Marks When Evaluating Their Similarity

The second factor is the overall similarity of the two marks in sound, appearance, manner of use, and overall commercial impression. *Frehling*, 192 F.3d

at 1335.  This "is determined by considering the overall impression created by the marks as a whole rather than simply comparing individual features of the marks." *John H. Harland*, 711 F.2d at 975.  The district court erred because it engaged in too limited an analysis – it examined the parties' logos, which is not the same as examining the overall impression created by the parties' use of the marks.  This is a legal error reviewed de novo.

To evaluate the similarity of the parties' marks, a court should first consider the strength of the plaintiff's marks, which then governs the amount of weight given any differences it may later find to exist between the parties' overall uses of the mark.  If a plaintiff's mark is strong, consumers give less weight to differences between it and other marks, and therefore are more likely to see similar marks as associated in some manner.  *Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1182 (11th Cir. 1985) (greater scope of protection is afforded to stronger marks); *UMG Recordings, Inc. v. Mattel, Inc.,* 100 U.S.P.Q.2d 1868 *20 (T.T.A.B. 2011) ("as the fame of the mark increases . . . the degree of similarity between the marks necessary to support a conclusion of likely confusion declines").  Armed with a proper analysis of the strength of the plaintiff's mark, a court should then consider the overall impression made by the parties' use of the marks in commerce as whole, including their appearance, sound, meaning and manner of use.  *John H. Harland*, 711 F.2d at 975.

Here, the district court concluded that the "marks" are "somewhat similar in sound as they both begin with the word Foremost," conducted a side-by-side comparison of the parties' logos which it found are "different considering both marks use different colors, fonts and logos," and then held that:

> the analysis [of whether two marks are similar enough to create a likelihood of confusion] turns, however, on the meaning of the words used in the respective marks. FT&E's foremost mark is followed by the words "title" and "escrow." While it is true that the word title refers to insurance, that is not something necessarily obvious to the public. Although both marks use the word Foremost, that on its own is not sufficient to find a likelihood of confusion and viewing the mark as a whole, there are enough differences to find that this factor does not weigh in favor of a finding of a likelihood of confusion.

(Doc. 151 at 12). This holding was a clear error because the district court only conducted a side-by-side analysis of the parties' logos without fully and properly analyzing the entire commercial impression given by both parties' overall use of the mark. Therefore, the district court (1) did not consider the fact that the word Foremost, the subject of registered trademarks apart from the logo, is the dominant theme of FCOA's family of marks and of each individual mark, and also the dominant theme of FT&E's advertising; (2) did not factor into its analysis the undisputed fact that FT&E is using the word Foremost by itself to advertise its insurance services; (3) wrongly concluded that the parties' logos are dissimilar when in fact they are similar; (4) wrongly concluded that FT&E's use of the generic phrase

"Title & Escrow" serves to differentiate FT&E from FCOA when in fact it does not; and (5) considered this factor after determining the Foremost marks are weak, which in fact is not the case, and therefore any differences in the overall commercial impression made by the parties' marks are entitled to less weight than the district court would have given them. The district court thus erroneously held this factor to weigh in favor of FT&E when in fact it weighs in favor of FCOA.

First, the district court seemingly concluded that the overall commercial impression of the parties' marks should be determined solely by examination of the sound, meaning and appearance of the parties' logos. This was a legal error. It was proper to consider the parties' logos, of course, because they do show how the parties use the mark to some degree, but it is error to engage only in a strict side-by-side analysis of the logos when the services offered by the parties are not found by the consumer side by side in the marketplace. *Daddy's Junky Music Stores*, 109 F.3d at 283; *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983). An analysis of the logos alone does not fully consider the overall commercial impression made by the parties' respective uses of the marks as a whole, which is the true test under this factor. *John H. Harland*, 711 F.2d at 975; *Daddy's Junky Music Stores*, 109 F.3d at 283-84.

It is from that first error – the district court's failure to fully and properly consider the overall commercial impression of the parties' use of the marks – that

the remaining errors flow.  Because the court conducted too limited an analysis, it did not weigh into its determination many other subjects which a court must consider when analyzing whether the parties' use of the marks is similar.  This is an error of law reviewed de novo (but there is clear error to the extent any question of fact is involved).

For instance, the district court did not weigh into its analysis the fact that the word Foremost is the dominant theme of FCOA's family of marks, which tends to show that confusion is more likely when a junior user adopts the word.  *Conagra*, 743 F.2d at 1514-15.

FCOA holds a family of over twenty currently-registered marks which contain the term Foremost and which are used in the insurance industry.  (Doc. 86 ¶ 6).  "A family of marks may have a synergistic recognition that is greater than the sum of each mark."  *Quality Inns, Int'l v. McDonald's Corp.*, 695 F.Supp. 198, 212 (D. Md. 1989).  When a mark holder owns a family of marks, consumers may become accustomed to the holder's varied usage of its core mark such that they naturally perceive an infringer's mark as yet another variation from the same source even if the infringer's mark is slightly different in some ways.  *Humana, Inc. v. Humanomics, Inc.*, 3 U.S.P.Q.2d 1696, 1700 (T.T.A.B. 1987); *E.&J. Gallo Winery v. Consorzio del Gallo,* 782 F.Supp. 457 (N.D. Cal. 1991).  When a family of marks is involved, the full question is "whether [the junior user's] mark would be likely to

be viewed as a member of [the senior user's] family of marks."  *7-Eleven, Inc. v. Wechsler*, 83 U.S.P.Q.2d 1715, 1720 (T.T.A.B. 2007).

The marks in FCOA's family are all variations of its core Foremost mark. Some of FCOA's marks *are* the word Foremost, and every mark uses the term Foremost as its dominant element.  (Doc. 86 ¶ 6; doc. 1-1 through 1-5).  The word Foremost is both the dominant theme in the Foremost family of marks and the dominant element in each of those individual marks.  It is the tie that binds together the significant marketing efforts undertaken by FCOA to promote Foremost products.  This is to be expected, of course, because FCOA is marketing various lines of insurance to consumers across the country and desires to tie them all together under one name: Foremost.

As the Court has made clear, when the definitive aspect of the defendant's business name *is* the plaintiff's mark, consumer confusion easily follows.  For example, in *Conagra,* plaintiff Conagra sought to stop Singleton Shrimp Boats from using the Singleton name in the shrimp trade.  Because Singleton Shrimp Boats used Conagra's very mark, in identical form, as the most prominent element of its own advertising scheme, it had adopted a business name confusingly similar to Conagra's mark:

> The distinctive aspect of the defendant's business name, Singleton Shrimp Boats, is the name Singleton, which of course is identical to the plaintiff's mark.  *See, e.g. Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675

> F.2d 1160, 1165-66 (11th Cir. 1982) (the business name
> "Safeway Discount Center" or "Drugs" was found to
> infringe the name "Safeway," the word "Discount Center"
> or "Discount Drugs" were found to be merely descriptive).
> The Singleton name is set out, apart from the words
> Shrimp Boats, on all of defendant's trucks, signs, media
> advertising and business cards. We have no trouble
> concluding that the defendant has adopted a business name
> confusingly similar to plaintiff's mark.

*Conagra*, 743 F.2d at 1514-15; s*ee also Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1313, 1313 n.7 (11th Cir. 1999) ("although Carnival Cajun Classics is different from Carnival, the word "carnival" is the most prominent identifying feature of the former"); J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition § 23:42* (5th ed.) *(*"it is appropriate in determining the likelihood of confusion to give greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer"). The district court does not appear to have considered this point – the definitive aspect of the Foremost marks is the definitive aspect of FT&E's business name. Nor did the district court compare the registered Foremost marks to FT&E's mark. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283 (district court erred by ignoring the Daddy's mark and assessing similarity only by analyzing "Daddy's Junky Music Store"; "'Daddy's' is not just a *component* of the "Daddy's" marks: it *is* the marks") (emphasis in original).

The district court also did not weigh into its analysis the fact that FT&E is using the term as the dominant theme of *its* advertising. FT&E uses the word Foremost at the beginning of its business name, as the largest element of its logo and, as discussed below, often refers to itself alone as "Foremost." This too favors a finding that consumer confusion is likely.

For example, in *Safeway Stores*, grocer Safeway sought to prevent drugstore Safeway Discount Drugs ("Discount") from using the mark Safeway. The Court held that Discount's prominent use of the dominant theme of Safeway's advertising scheme – the word Safeway – along with other common and non-distinctive words rendered the overall commercial impression of its mark similar enough to Safeway's mark to weigh in favor of a likelihood of confusion even though the parties had somewhat different names and logos. *Safeway*, 675 F.2d at 1165-66. The Court stated:

> We agree that the overall effect of the designs of Safeway Stores and of Discount is similar. Safeway Stores spells out Safeway in large, capitalized block letters in its signs, price labels, letterhead and advertising. It does use a logo of a broad S within a circle on its letterhead and at times in its advertising, and its letter also includes the words "Stores, Inc." in capital letters approximately half the size of those spelling out Safeway. Neither the logo nor the additional words on the letterhead, however, are sufficiently important for us to alter our conclusion that the word Safeway is the dominant theme in any sign or reference to Safeway Stores. Discount's use of the word Safeway in large, capitalized block letters on its signs, letters and advertising is strikingly similar to the designs of Safeway Stores. Discount does also use the words "Discount Center," "Discount Drugs, Inc.," or "Discount" in

> references to itself. These additional words, however, are usually on lines below the word Safeway and often are in letters smaller in size than those spelling out Safeway.

*Id.* (internal citations and quotations omitted). This logic applies just as fully here. FT&E is using FCOA's mark as the dominant theme in its advertising, which weighs in favor of a likelihood of confusion.

Furthermore, the district court did not weigh into its analysis the significant fact that FT&E is using the word Foremost by itself to market its services to consumers. Thus, the Court failed to properly consider the full and true manner of FT&E's use of the mark. FT&E is indisputably utilizing FCOA's trademarked term Foremost entirely by itself to refer to FT&E.

It is undisputed that FT&E regularly calls itself Foremost when marketing its insurance services to consumers. Its website contains such phrases as "Foremost for Homeowners," "Choose Foremost," "Foremost's staff has experience in all facets of title insurance."[9] (Doc. 86 ¶ 36). So, FT&E is plainly calling itself Foremost and advertising that "Foremost" provides the services it is marketing. The marketplace vernacular for FT&E has essentially become "Foremost," as it has in FT&E's marketing materials and its own witnesses testimony. (Id. ¶¶ 36-38). This is

---

[9]     FT&E also uses the term "Foremost" by itself as a keyword for search engine optimization in web searches. (Doc. 86 ¶ 37). This means FT&E is using FCOA's mark to attract business to its website. *North Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1222 (11th Cir. 2008).

illustrated in part by FT&E's own employees, who repeatedly referred to FT&E as "Foremost" during their testimony. (Id. ¶ 38; *Health Net v. USA Healthnet, Inc.*, 26 U.S.P.Q.2d 1187, 1193 (C.D. Cal. 1993) (defendant's witness showed contracted term was often used)). FT&E also advertises as "Foremost" using direct word of mouth and through realtors. (Doc. 82-6 at 10:24-11:7, 82-1 at 114:22-115:5); *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.,* 128 F.3d 1111, 1115 (7th Cir. 1997) (where mark is used in a vocal sense, visual differences are irrelevant). The term Foremost, however, is FCOA's registered trademark. Thus, FT&E is regularly using FCOA's registered trademark Foremost by itself and without adornment of any kind to market its own insurance services.

And it is doing so by utilizing phrases that a company like FCOA might use in order to advertise its own insurance services, including "Choose Foremost," which FCOA actually uses itself.[10] For example, FCOA issues homeowners' insurance, so it very well might desire to advertise using the phrase "Foremost for Homeowners." After all, FCOA owns the registered mark "Foremost" and "for Homeowners" is generic wording. The commercial impression given by this phrase is that Foremost is offering services to homeowners, which is precisely what FCOA does. For further example, a user entering FT&E's website immediately encounters

---

[10] This would seem natural since both parties are in the insurance industry.

a pop-up window stating, "Let Foremost help you buy your next home." (Doc. 86 ¶ 26; doc. 85-29). This occurs upon entering FT&E's website, before a consumer sees FT&E's logo. (Id.). Therefore, a consumer is first told that it has contacted "Foremost" and only later is informed that it has actually contacted Foremost *Title & Escrow*.

FCOA uses very similar phrases to identify its insurance products. These include phrases such as "Choose Foremost" (which both parties are using), "Call the friendly Foremost agent for a quote," "Foremost has you covered," "Let Foremost help your business," "Call the specialists at Foremost for a quote today," "Foremost coverage has real life advantages," and "Get specialized coverage from "Foremost." (Doc. 85-1 at 8-12; doc. 83-2 at 640, 898).

Any of these phrases could just as equally be used to describe FCOA as FT&E, which is a logical result when both are operating in the insurance business. However, the district court did not weigh into its analysis this unadorned use by FT&E of FCOA's mark, which is identical to the sorts of uses FCOA makes of its own marks. When a defendant is using the plaintiff's unadorned mark to refer to itself, confusion is likely to follow, and here FT&E is doing so in the same industry as FCOA.

In addition, the district court wrongly concluded that the parties' logos, which are only one part of the inquiry into overall commercial use of a mark, are dissimilar

when in fact they are similar.[11]  The court held that the "marks" are "somewhat similar in sound as they both begin with the word Foremost.  However, the appearance of the marks is different considering both marks use different colors, fonts and logos."  (Doc. 151 at 11).

Here are the parties' logos:

 

These logos are similar in much more than just the sound of the word "Foremost."  Both logos have wording on the right and a stylized F image on the left.  Both logos position the word Foremost at the top of the right half of the logo, written in bold, all-capital lettering with rounded corners.  Both logos then place a line of text beneath the word Foremost which is smaller, non-bold, consists of all-capital lettering, and is aligned under it.  Both logos then contain a square element on the left side which is slightly larger than the typeface on the right.  Both square elements contain a stylized letter "F."  While the colors are somewhat different and the fonts are not identical, these two logos are similar enough in overall composition to weigh in favor of a likelihood of confusion.  *Safeway Stores, Inc.* 675 F.2d at 1165-66 (overall effect of the designs are similar, even though some different individual features); *Meridian Mut. Ins. Co.,* 128 F.3d at 1115-16 (courts must

---

[11]     This is a factual conclusion reviewed under a clear error standard.

examine logos in view of what happens in the marketplace, deemphasizing small differences in logos such as coloring and added design elements).

While there are some minor differences in these logos, consumers often do not recall these minor differences when recalling logos from memory. *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1188 (6th Cir. 1988) (marks at issue "similar enough" taking into consideration consumers' tendency to have "hazy" recollection); *Meridian Mut. Ins. Co.,* 128 F.3d at 1115 (marks are not encountered side-by-side in the insurance industry; therefore, it is inappropriate to focus on minor stylistic differences). Because insurance services are not encountered side by side in a retail setting with their logos displayed so that potential buyers can readily identify their differences, consumers viewing either logo must rely on their memory to discern the difference in the source of the two services. Side-by-side analysis is warned against in that scenario. *Beer Nuts,* 711 F.2d at 941 (side-by-side comparison is not the test; marks must be compared in light of the marketplace). Therefore, minor differences in the parties' logos are of little import because they are not likely to distinguish FT&E's services from FCOA's. *Wynn Oil,* 839 F.2d at 1188 ("Classic" and "Classic Car Wash" substantially similar). All in all, these logos are quite similar and are used in an industry where consumers do not see them side by side, which weighs in favor of confusion. *Id.* at 1187; *Meridian Mut. Ins. Co.,* 128 F.3d at 1115.

The district court also erroneously concluded that FT&E's addition of the phrase "title and escrow" helps differentiate FT&E from FCOA because consumers might not know that the word "title" refers to title insurance. (Doc. 151 at 12). The opposite is true. The phrase "title and escrow" is a generic term which does not weigh against a likelihood of confusion because it does not lend distinctiveness to FT&E's name. *Safeway Stores*, 675 F.2d at 1166. The Court explained this in *Safeway* as well:

> Moreover, whether an addition is sufficient to prevent confusion in a particular instance depends on the strength of the main part of the mark and the distinctiveness of the additional feature. Here, as we have noted, the word Safeway is a relatively strong trademark. The words "discount center" or "discount drugs" are quite common and lend no distinctiveness to Discount's name.

*Id.*; *John H. Harland*, 711 F.2d at 976 ("although the marks ultimately must be considered as a whole, the focus of the inquiry regarding appearance and sound is on the non-generic portion").

Here, the only non-generic portion of the parties' marks is Foremost. So, for example, Foremost Insurance Company and Foremost Title & Escrow are essentially identical. And consumers may expect FCOA, the owner of a family of marks, to utilize variations upon its core Foremost mark (which, of course, it does). Thus, the district court erroneously concluded that these words weigh against a likelihood of confusion when in fact their generic nature means that they do not lend any

distinctiveness to FT&E's name which could distinguish it from the Foremost marks. *Id.*

Finally, the district court considered the similarity of the parties' marks against the backdrop of significant third-party use which in fact did not exist. When a mark is strong, consumers are less likely to notice small differences in the way it is used. When a mark is weak, they are more likely. *Freedom Sav. & Loan Ass'n,* 757 F.2d at 1183. Here, the district court erroneously determined that the Foremost marks are weak when analyzing their strength. In fact, they are strong and therefore, when analyzing the similarity of the parties' marks, any differences in the Foremost marks and FT&E's mark are entitled to less weight than the district court would have given them.

In summary, the district court committed a combination of errors whereby it analyzed only the parties' logos side by side without considering the overall commercial impression made by the parties' uses of the marks. The district court did not weigh into its analysis the facts that (1) consumers do not encounter the parties' services (or logos, or marks) side by side in the marketplace, (2) FT&E is using solely the word Foremost to describe itself; (3) the word Foremost is the dominant theme of FCOA's entire family of marks and consumers might therefore expect that it will use variations upon that theme; (4) the word Foremost is also the dominant theme of FT&E's marketing efforts; (5) FT&E's use of the generic phrase

"title and escrow" does not distinguish FT&E from FCOA, and (6) the parties' logos are actually quite similar.

In conclusion, the overall compression made by FT&E's use of FCOA's trademarked term Foremost is sufficiently similar to FCOA's use that it weighs in favor of a likelihood of confusion. FT&E uses the dominant theme of FCOA's family of marks as the dominant theme of its own insurance business, refers to itself solely as Foremost when advertising to consumers, and has adopted a similar logo. When properly applied, this factor weighs in favor of a finding of infringement.

### III.     Factor 3 – The Similarity of the Parties' Products

The district court found that "FCOA offers insurance related products and FT&E offers title insurance as one of its main products. Although those products are different and FCOA and FT&E are not competitors, reasonable consumers could conclude that both companies' products are attributable to a single source." (Doc. 151 at 12-13). Thus, the court found this factor to favor consumer confusion. FCOA takes no issue with that determination.

The district court did not state the degree of weight it afforded to this factor as compared to the others, but if "reasonable consumers could conclude that both companies' products are attributable to a single source," that tends strongly in favor of a likelihood of confusion. Basically, that *is* a likelihood of confusion. Since both

parties are selling insurance, it logically follows that consumers could become confused. Therefore, the Court should give this factor significant weight in its overall analysis.

## IV. The District Court Did Not Properly Consider Factors 4 and 5 – The Similarity of the Parties' Retail Outlets, Customers, and Advertising Media

Here, the district court combined two *Frehling* factors – the similarity of the parties' retail outlets and customers, and the similarity of their advertising media, which are typically labeled factors four and five – into one inquiry. (Doc. 151 at 13-15).

However, the court did not analyze the parties' advertising media; this topic appears to have escaped its attention. The court did not weigh or consider this subject and seemingly did not factor the parties' advertising media into its analysis. (Id.). The district court's only statement on this point is the true but incomplete statement that "both parties advertise their services using online advertising, websites and social media." (Id. at 14). Thus, the district court effectively ignored the similarity of the parties' advertising media altogether – it grouped that fifth factor into the fourth and then never evaluated its legal effect. This was a legal error because FCOA was therefore deprived of consideration of a factor which weighs squarely in its favor.

Both parties advertise to the insurance-buying public generally and to homeowners, developers, and landlords specifically. Both parties advertise through websites, through social media, and via direct email. Both parties also use magazine ads – FCOA advertises in AARP magazine, which is distributed throughout the country and therefore throughout Florida, where FT&E purchases magazine ads. Both parties also advertise at trade shows and other public events, and through brochures. (Doc. 86 ¶¶ 12-13, 17-20, 25-31).

"If a plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *AmBrit*, 812 F.2d at 1542. The standard is whether there is likely to be significant enough overlap that a possibility of confusion could result. *Frehling*, 192 F.3d at 1340. Here, the parties' advertising media are indeed identical because they both include internet advertising, websites, social media, magazine ads, brochures, trade shows, public events, and direct mailings, which weighs squarely in favor of consumer confusion; both parties use the same advertising media. *See also, PlayNation*, 924 F.3d at 1168-69. The parties' advertising media is a stand-alone factor which the district court should have, but did not, weigh in FCOA's favor. This deprived FCOA of an entire *Frehling* factor which weighs in favor of consumer confusion.

In addition, the district court also clearly erred when it determined that the parties' customer bases "appear to differ" because FT&E's client base is referred

from SFK and because insurance agents may be involved. After outlining the parties' arguments, the court held:

> Because FT&E's client base is comprised mostly of SFK clients and referrals and because FT&E's customers generally make their decisions based on recommendations from broker or agents, most of the parties' customers appear to differ. *See Standard Accident Ins. Co v. Standard Surety & Casualty Co. of N.Y.*, 53 F.2d 119, 120-21 (S.D.N.Y. 1931) (finding that "the brokers, agents and insurance managers who actually decide in what company to place the business are sufficiently familiar with the personnel, location, etc. of the various companies that they could not be misled by mere similarity of names as the general public would be). However, because both parties offer insurance related products to homeowners, FCOA has presented evidence of some potential degree of overlap between the parties' customers. But the Court gives this factor little weight in its overall analysis, given the significant differences in the kinds of customers targeted by these companies. Thus, the Court finds this factor is neutral and favors neither party because it does not weigh significantly in favor of a finding of a likelihood of confusion.

(Doc. 151 at 14-15). There are numerous clear errors in this holding. The parties' customers, both actual and prospective, are completely identical. They are real property purchasers who need insurance. Both parties market to those consumers, both parties seek to obtain them as customers (in other words, target them), and both parties have had them as actual past customers.

First, the fact that FT&E's clients are referred to it by a law firm does not change who they are. FCOA's and FT&E's customers are identical – they are real property purchasers (or owners) who need insurance. Referred to FT&E by a law

firm or not – they are still homeowners seeking insurance when buying a home, precisely the same consumers FCOA markets to. *Safeway Stores, Inc.,* 675 F.2d at 1166 ("even if the particular individuals buying goods at the parties' stores differ, the parties would cater to the general kinds of individuals").

Second, the fact that "FT&E's customers generally make their decisions based on recommendations from brokers or agents" is not pertinent here. The customers remain the same whether brokers are involved or not, but more importantly, the district court only analyzed *FT&E's actual past customers*. The question is consumer confusion in the marketplace, not the confusion of FT&E's small group of actual past customers. *Standard Accident Insurance Co. v. Standard Surety & Casualty Company of New York*, 53 F.2d 119, 120-21 (S.D.N.Y. 1931), upon which the district court relied, fails to recognize this distinction. To hinge a decision about customer bases on only the actual past customers of one of the parties is to ignore the overarching question of consumer confusion in favor of analysis of only a limited subset of consumers.

In addition, it is irrelevant that FT&E's customers might "make their decisions based on recommendations from brokers or agents." The *Standard Accident* court found that pertinent because it meant that agents and brokers, who effectively decide which insurance companies their clients will purchase from, know the difference between similarly-named insurance companies. *Standard Acc.*, 53 F.2d at 120-21.

That idea is irrelevant here because this is not a trademark dispute between two insurers, and so the similarities in FCOA's and FT&E's mark use cannot be alleviated by the existence of a learned insurance agent who knows the difference between insurers. That logic *might* apply when two insurers are involved, but the instant case does not involve two insurers.

Here, FT&E *is* the broker. It *is* the agent. The fact that FT&E may decide what brand of title insurance its customers will purchase does not change the fact that consumers may think that FT&E is associated with FCOA during this process. In other words, while an agent like FT&E may actually decide what title insurance company is used, customers who are using FT&E for insurance services could still believe that they are receiving those insurance services from an entity connected with FCOA.

Third, when measuring the parties' customer bases for purposes of likelihood of confusion, a court should consider primarily who those parties target as customers, not solely who they have managed to obtain. *See, e.g. Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes and of Malta v. The Fla. Priory of the Knights Hospitallers of the Sovereign Order of St. John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171 1188 (11th Cir. 2015) (the parties "cater to the same general kinds of individuals"); *Safeway Stores*, 675 F.2d at 1166 (parties' customer bases overlap because they "would cater to the same general kinds

of individuals"); *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 n.7 (11th Cir. 1985) ("It would overburden a plaintiff to ask that he or she prove through direct evidence that a large number of customers actually use the services of both parties; hence it should be enough to show that the same customers are likely to use both services"). If the latter were the test, infringement by a new company could not be evaluated until it obtains enough paying customers to allow a court to determine who those customers are. In the instant case, those two groups are identical – both parties target, or cater to (and both parties have obtained as customers), real property purchasers who need insurance.

Thus, the district court erred when it held that the parties' customer bases differed simply because FT&E's customers come from SFK and insurance agents may be involved. Both parties are acting as insurance businesses selling insurance policies. Both parties' products are purchased by persons who are buying homes or other structures – FCOA is selling and transacting various insurance for homes and other structures while FT&E is selling and transacting title insurance. All in all, if properly considered, this factor weighs in favor of FCOA.

### V.   *Factors 6 and 7 – FT&E's Intent and Actual Confusion*

The sixth and seventh factors are the defendant's intent and the existence of actual confusion. *Frehling*, 192 F.3d at 1335. As to intent, the district court found

that "this factor does not favor a finding of a likelihood of confusion." (Doc. 151 at 16). As to actual confusion, the court found that FCOA offered no evidence of actual confusion. (Id. at 18). FCOA does not take issue with those determinations in this brief, but a lack of actual confusion ought not weigh against FCOA. FT&E has conducted such minimal business that it is entirely possible that there is no actual confusion to find, and the Court therefore should weigh that factor neutral. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988) (lack of evidence of confusion "neither helps nor hurts" plaintiff's case where the products are not in the market together for a substantial period of time); *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 949 (Fed. Cir. 2000) (absence of actual confusion explained by low volume of defendant's sales).

## *VI.    Summary*

In summary, for the reasons enumerated above, the trial court erred when considering the strength of FCOA's mark, the similarity of the parties' uses of the marks as a whole, the identical advertising media utilized by the parties, and their customer bases. There is a likelihood of confusion between the parties' marks as a matter of law. FCOA's marks are presumptively strong, and there was no evidence of third-party use which is diminishing that strength. The commercial strength of the FCOA marks is also undisputed. The overall commercial impression made by

the parties' use of the marks is similar, particularly since FT&E is using the term Foremost to refer to itself, and the parties' advertising and customer bases are identical. When evaluated fully and properly, these factors weigh in favor of a likelihood of consumer confusion, and FCOA should have received summary judgment.

## CONCLUSION

For the reasons expressed above, the Court should reverse the judgment in favor of FT&E and direct that judgment be entered in favor of FCOA, with the precise relief to be accorded FCOA to be determined by the district court upon remand.

## CERTIFICATE OF COMPLIANCE

I certify that this brief meets the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7). The sections of this brief enumerated in Eleventh Circuit Rule 28(1)(h)-(l) contain 12,638 words.

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2019, I electronically filed the foregoing document as well as overnighted the original and six copies to the Clerk of the Court. I also certify that the foregoing is being served on October 23, 2019, via e-mail & U.S. Mail to:

Robert A. Stok
Natasha Shaikh
Stok Kon + Braverman
One East Broward Boulevard Suite 915
Fort Lauderdale, FL 33301
RStok@stoklaw.com
NShaikh@stoklaw.com
service@stoklaw.com

WILLIAM D. HORGAN (FBN: 176877)
ADRIENNE C. LOVE (FBN: 21835)
PENNINGTON, P.A.
215 South Monroe Street, Suite 200
Tallahassee, FL 32301
850-222-3533
whorgan@penningtonlaw.com
adrienne@penningtonlaw.com
COUNSEL FOR APPELLANT FCOA, LLC